**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DISHAWN A. JACKSON,** :
                                   :     **Case No. 2:16-cv-00977**

        **Plaintiff,** :

                                   :     **JUDGE ALGENON L. MARBLEY**

    **v.** :

                                   :     **Magistrate Judge Vascura**

**OLD DOMINION FREIGHT LINE,** :
       **Defendant.** :

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendant Old Dominion Freight Line, Inc. (ECF No. 60), Plaintiff's Motion for Leave to File Sur-Reply in Opposition to the Defendant's Motion Summary Judgment (ECF No. 68), and Plaintiff's Motion to Strike Affidavit of Ricardo Colon (ECF No. 66). For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motions to Strike Affidavit and File Sur-Reply are **DENIED**.

### I.       BACKGROUND

#### A.     Factual Background

Defendant Old Dominion Freight Line, Inc. ("OD") is a less-than-truckload motor carrier that operates a network of Service Centers ("SC"), one of which is located in Columbus, Ohio (the "COH" Service Center). OD hired Plaintiff Dishawn Jackson as a dockworker at COH on October 6, 2003. (ECF No. 60-1 at 107-08). Jackson's job duties included breaking down and organizing freight that came into the SC and loading freight onto trailers leaving the SC. (*Id.* at 110, 130, Ex. G).

During his employment at OD, Mr. Jackson took two separate leaves under the FMLA, one intermittently for the care of his mother and one for the birth of his child from November 10,

1

2015 to January 1, 2016. (*Id.* at 213-14). Mr. Jackson testified that after he returned from FMLA leave after the birth of his son, he experienced tension with his supervisors, including William Pressler, Tony Green, and Robbie Smith. (*Id.* at 214). He contends that the supervisors were writing him up for coming in late, but not writing anyone else up for the same behavior. (*Id.* at 214-215).

Also during his employment at OD, Mr. Jackson worked on his passion outside of work—music. Mr. Jackson raps and writes his own lyrics and beats. (*Id.* at 49-50). He has also shot music videos. (*Id.*). Carlos McNair was a co-worker of Mr. Jackson's at OD and shared his interest in rap music. (*Id.* at 186). Mr. McNair went to the studio Mr. Jackson used and rapped in two of Mr. Jackson's videos. (*Id.* at 187). In early March of 2016, Mr. McNair asked Mr. Jackson for a beat pattern that Mr. Jackson created, and Mr. Jackson agreed to send it to him electronically. (ECF No. 63-1 at PageID 1387; ECF No. 60-1 at 188-89). On March 18, 2016, Mr. Jackson learned through a co-worker that Mr. McNair was upset with him because he never got the beat that Mr. Jackson said he would send. (ECF No. 60-1 at 189). Mr. Jackson concluded that the electronic attachment must have failed, but decided that he would not associate with Mr. McNair any longer because he jumped to an incorrect conclusion without confronting Mr. Jackson about it first. (ECF No. 63-1 at PageID 1387).

On March 30, 2016, Mr. McNair came into the break room at OD and sat down next to Mr. Jackson and said: "What's up, rapper?" (ECF No. 60-1 at 194-95). Mr. Jackson ignored him and put his headphones in, and did not hear anything else that Mr. McNair said, though Mr. Jackson believes Mr. McNair continued to make comments to him. (*Id.*). The next day, Mr. McNair yelled at Mr. Jackson because someone told him that Mr. Jackson was spreading a rumor that Mr. McNair was posting things on his Facebook page about Mr. Jackson. (*Id.* at 196). Mr.

Jackson testified that he did not tell anyone that Mr. McNair was posting anything on Facebook about him, and he was unsure whether Mr. McNair did so. (*Id.* at 196-97). Mr. Jackson stated that a supervisor, Maurice Tuff, was standing next to him when Mr. McNair yelled at him and heard the commotion. (*Id.* at 197).

On Friday, April 1, 2016, Mr. Jackson and Mr. McNair got into two altercations at work. Around 10:00 a.m., the first altercation ensued on the dock outside of a break room. (*Id.* at 166). Mr. Jackson testified that he and Mr. McNair were driving their forklifts in opposite directions on the dock and Mr. McNair called him a "sucker" and said he was "soft." (*Id.* at 167). Mr. Jackson kept driving, picked up his next assignment, and then headed to the break room to get something to drink. (*Id.* at 168). Mr. McNair was standing in front of the break room door and talking to another co-worker, making remarks about Mr. Jackson such as "Your boy is soft. He's a sucker" and "You know it's a sucker-free Friday." (*Id.* at 169). Mr. Jackson then asked Mr. McNair why he was putting on a show for everybody, and Mr. McNair responded that they could "step outside." (*Id.*). Mr. Jackson asked if Mr. McNair was threatening him, and then another employee, Ricardo Colon, grabbed Mr. McNair and took him into the break room to interrupt the argument. (*Id.* at 169-70). Mr. Jackson then went on to finish his route. (*Id.* at 170).

Then, around 10:30 a.m., the second incident began on the dock. Mr. Jackson was driving a forklift and Mr. McNair was walking toward his equipment. (*Id.* at 171). Mr. McNair again called Mr. Jackson "soft" and a "sucker." (*Id.* at 172). Mr. Jackson asked him why he was acting that way, and inquired into whether it was because he was upset about not receiving the beat pattern or because they had not been working or speaking to each other anymore. (*Id.*). Mr. McNair then started clapping and Mr. Jackson told Mr. McNair that he had done a lot for him. (*Id.*). Mr. Jackson testified that Mr. McNair then made a hand gesture with two fingers pointing

out to simulate a gun close to Mr. Jackson's face, and said he "had bullets for niggers like [Mr. Jackson]." (*Id.* at 173-74). Mr. Jackson stopped the forklift and got down from the machine. (*Id.* at 174-75). He asked Mr. McNair, "How are you going to pull a gun on me and I had done a lot for you, you're in my videos, and I have been there for you as a friend. And you going to try to pull a gun out on me. You done been in my house. You done been around my family." (*Id.* at 175). Mr. McNair was then pushed away by employees David Pompi and Ricardo Colon. (*Id.* at 176). After putting his last skid on the trailer, Mr. Jackson reported the incident to Maurice Tuff, a dock supervisor. (*Id.* at 177).

Other employees witnessed both of these incidents. As to the first incident, dockworker Daniel Hayes testified that he witnessed both Mr. McNair and Mr. Jackson cursing, and using profanity such as "bitch," "bitches," and the "N-word". (ECF No. 60-5 at 9, 14). He did not hear Mr. Jackson make any threats of violence toward Mr. McNair, and he did not observe any physical fighting. (*Id.* at 7, 8). Mr. Hayes testified that profanity is commonly used on the dock, including the N-word by black employees, but that although it "gets hostile" at times, "the level that happened that day, no we don't, get that – that rambunctious, no." (*Id.* at 17-18). Mr. Hayes did not feel the need to report the incident to management, and he did not feel that his life was in jeopardy or threatened in any way. (*Id.* at 16-17).

Another employee, Mr. Jody Messer, also witnessed the altercation outside the break room, and testified he heard "yelling and cussing and the N word flying." (ECF No. 60-6 at 7). He first testified that he did not personally hear Mr. Jackson say the "the N word" but later stated he could not say whether or not Mr. Jackson used the racial slur, though he knew for a fact Mr. McNair did. (*Id.* at 8-19, 14). Mr. Messer testified that it appeared that Mr. McNair was "more of the aggressor," as he was louder and using the "N word" and "lots of curse words." (*Id.* at 8-

9). He stated that he saw Mr. McNair using gang signs, such as pretending to shoot a gun. (*Id.* at 14). Mr. Messer waited around because he was not sure if he would need to separate Mr. McNair and Mr. Jackson, as he did not want anyone to get seriously injured." (*Id.* at 8, 15). They ended up calming down, so Mr. Messer left and continued his work. (*Id.* at 8).

As to the second incident, dockworker David Pompi observed Mr. McNair walking next to Mr. Jackson's forklift, and saw Mr. Jackson get off the lift during the confrontation. (ECF No. 60-7 at 9). Mr. Pompi testified that Mr. McNair and Mr. Jackson were maybe a foot or two apart during the most heated part of the argument. (*Id.* at 9). Mr. Pompi saw Mr. Colon—the dockworker who broke up the first altercation—pull Mr. McNair away. Mr. Pompi then stepped in to "separate them before it . . . got a chance to get out of hand." (*Id.* at 21). Mr. Colon then walked away with Mr. McNair, and Mr. Pompi walked away with Mr. Jackson. (*Id.* at 9). Mr. Pompi testified that he did not feel like his life was in danger, but that it was a pretty serious argument. (*Id.* at 25). He further testified that he did not feel the need to report the incident to management, and that he honestly believed that both men would keep their jobs. (*Id.*).

The Monday following the two altercations, at the suggestion of his wife, Mr. Messer reported the break room incident to management because of safety concerns. (ECF No. 60-6 at 9-10). Mr. Messer reported the incident to Mr. Tony Green, Assistant Service Center Manager, and there is a factual dispute over whether Mr. Messer's report was the first Mr. Green had heard of the incident, or whether other employees had already reported the altercation to Mr. Green. (*Compare* ECF No. 60-6 (Mr. Messer testified that Mr. Green told him he had already heard of the incident from others) *with* (ECF No. 60-2 (Mr. Green testified that Mr. Messer made him aware of the incident)). In any event, after Mr. Messer's report, Mr. Green reported the altercation to Mr. Bill Pressler, Service Center Manager. (ECF No. 60-2 at 14; ECF No. 60-3 at

12). Mr. Green and Mr. Pressler then conducted an investigation that included interviewing several employees, which led to Mr. Green and Mr. Pressler uncovering the second incident on the dock that Mr. Messer had not witnessed. (ECF No. 60-2 at 30; *id.* at Ex. 1). Some of the employees told Mr. Pressler and/or Mr. Green that the fights involved profanity, racial slurs, and threats of violence. (ECF No. 60-3, 18-19; ECF No. 60-2 at 16). No one stated the fights ever became physical, and everyone agrees that co-workers stepped in to separate Mr. McNair and Mr. Jackson before any physical altercation occurred. (ECF No. 60-2 at 18; ECF No. 60-4 at 57). In addition to conducting interviews, Mr. Green and Mr. Pressler reviewed security footage of the second altercation on the dock. (ECF No. 60-3 at 13; ECF No. 60-2 at 14, 29).

Also on Monday, April 4, Mr. Green sent an email to Mr. John Collins, an Human Resources ("HR") supervisor, explaining that there was an altercation on the dock between Mr. McNair and Mr. Jackson. (ECF No. 62-2, Ex. 2). The email states that Mr. Messer informed Mr. Green that Mr. Jackson told him that Mr. McNair threatened to shoot him and his family. (*Id.*). The email also states that Mr. Messer said he told Ms. Tina Stone (a Human Resources employee) that "they were pushing and had to be separated." (*Id.*). Mr. Messer testified that he never spoke to Ms. Stone about the incident. (ECF No. 60-6 at 12-13). After reviewing the security footage, Mr. Green sent a follow up email to Mr. Collins, stating that the video shows that Mr. McNair "track[ed]" Mr. Jackson down, and that Mr. McNair "put his hand in [Mr. Jackson's] face which prompted [Mr. Jackson] to get off his lift . . . .". (ECF No. 62-2, Ex. 2).

The next day, on April 5, Mr. Pressler and Mr. Green met with Mr. Jackson and informed him that they were suspending him pending OD's investigation into the two altercations between him and Mr. McNair. (ECF No. 60-1 at 161-62). Around 6:30 in the morning on April 5, Mr. Jackson called Mr. Green and asked for the basis of his suspension. (*Id.* at 164). Mr. Green told

him that he understood it to be harassment and threats of violence, to which Mr. Jackson responded that he was the one threatened and harassed. (*Id.*). Mr. Green responded that it was out of his hands, and that it was Mr. Pressler's decision. (*Id.*). Mr. Pressler called Mr. Jackson later that day and Mr. Jackson again asked why he was suspended. (*Id.* at 163). Mr. Pressler stated that he had not gotten word back from corporate on their decision and he was waiting to hear from them. (*Id.*).

On April 6, Mr. Collins spoke to Mr. Jackson and Mr. McNair separately by telephone to hear their version of events. (*Id.* at 226, Ex J, K). Mr. Jackson and Mr. McNair's versions of events conflicted. (*Id.* at Ex. J, K). Later that day, Mr. Pressler called Mr. Jackson to tell him that that he was being terminated. (*Id.* at 163-64). Mr. McNair was also terminated. (ECF No. 60-4, Ex. D). Mr. Pressler told Mr. Jackson that he was terminated for "fighting on company property and causing a hostile work environment." (ECF No. 60-1 at 160). Dissatisfied with the decision, Mr. Jackson followed up with Mr. Pressler's boss, Regional Vice President Craig Evans. (ECF No. 60-8 at 28-29). On April 11, Mr. Evans returned Mr. Jackson's phone call, and Mr. Jackson told him that he felt as though he was wrongfully terminated, but Mr. Evans stated that the termination of both parties would stand. (*Id.* at 29). Mr. Evans testified that he felt the investigation was thorough and handled properly, and an internal email from April 8 states that he agrees that both men should have been terminated. (*Id.* at 30; Ex. E).

Following his termination, Mr. Jackson did not receive a notice that he was entitled to continue his health-insurance benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), so he contacted the U.S. Department of Labor ("DOL"). (ECF No. 60-1 at Ex. O). DOL then contacted OD. (ECF No. 6 at 15-16). OD typically uses a third-party vendor to send COBRA notices, as it did in Mr. Jackson's case, so after receiving notice from DOL, OD

followed-up with the third-party vendor and learned that the notice was inadvertently sent only to the address provided for child support garnishments. (*Id.*). No copy was sent to Mr. Jackson. OD then instructed its vendor to send notice to Mr. Jackson, and extended the COBRA election period to begin on the date the notice was sent. (*Id.*). Mr. Jackson declined COBRA coverage. (ECF No. 60-1 at 21-22).

### B. Procedural Background

Mr. Jackson filed this lawsuit in the Franklin County Common Pleas Court on September 9, 2016. (ECF No. 1). OD removed the lawsuit to this Court on October 10, 2016. (*Id.*). In his complaint, Mr. Jackson alleges the following causes of action: (1) Family Medical Leave Act ("FMLA") retaliation; (2) defamation; (3) racial discrimination in the form of disparate treatment; and (4) violations of COBRA. (ECF No. 3). On August 14, 2017, OD filed the instant Motion for Summary Judgment. (ECF No. 60). Mr. Jackson filed a Response on September 5, 2017 (ECF No. 63) and OD filed its Reply on September 20, 2017 (ECF No. 65). OD attached an affidavit by employee Ricardo Colon to its Reply. (ECF No. 65-1). On September 26, 2017, Mr. Jackson filed a Motion to Strike the Affidavit of Ricardo Colon (ECF No. 66). The Motion to Strike also purported to be a Sur-Reply to the Motion for Summary Judgment. (*Id.*). Mr. Jackson then officially moved for Leave to File Sur-Reply in Opposition to Defendant's Motion Summary Judgment on October 6, 2017. (ECF No. 68). The Motions for Summary Judgment, Leave to File Sur-Reply, and to Strike the Affidavit of Ricardo Colon are now fully briefed and ripe for decision.

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might

affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III.     ANALYSIS

#### A.     Preliminary Matters: the Sur-Reply Brief and the Affidavit of Ricardo Colon

The Court first addresses Mr. Jackson's Motion for Leave to File a Sur-Reply Brief in Opposition to the Defendant's Motion for Summary Judgment (ECF No. 68). The Federal Rules of Civil Procedure do not contemplate the filing of sur-replies, but "such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are

included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 481 (6th Cir. 2003)).  Local Rule 7.2 provides for the filing of opposing memoranda and replies, but states that "[n]o additional memoranda . . . are permitted except upon leave of court for good cause shown." S.D. OHIO CIV. R. 7.2(a)(2).  In ascertaining whether a movant has shown good cause to file additional memoranda, this Court has "broad discretion to manage its docket," *ACLU of Kentucky v. McCreary Cty.*, 607 F.3d 439, 451 (6th Cir. 2010 (citing *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)).

Here, Mr. Jackson argues that a Sur-Reply Brief is necessary in order to correct misstatements and distortions of the factual record made by the Defendant's Reply Brief.  The Court, however, can ascertain on its own, by examining the evidence in the record, whether any of OD's factual allegations are in fact misstatements or distortions of the record.  A sur-reply is neither necessary nor warranted to illuminate the factual issues any further.  This Court **DENIES** Mr. Jackson's Motion for Leave to File a Sur-Reply Brief in Opposition to the Defendant's Motion for Summary Judgment (ECF No. 68) for lack of good cause and **STRIKES** the sur-reply brief.

Mr. Jackson also filed a Motion to Strike the Affidavit of Ricardo Colon, arguing that the affidavit is a violation of the disclosure requirements of Federal Rule of Civil Procedure Rule 26. (ECF No. 66).  Rule 26 provides, in pertinent part,

> A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
>
>> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and *if the additional or corrective information has not otherwise been made known to the other parties during the discovery process* or in writing . . .

Fed. R. Civ. P. 26(e) (emphasis added).  Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).

Here, Mr. Ricardo Colon was not identified in OD's initial disclosures as a party who may have knowledge of the lawsuit.  OD did, however, identify Mr. Colon as a potential witness in their Responses to Plaintiff's First Set of Combined Discovery Requests.  (ECF No. 49-2 at PageID 743).  They stated that Mr. Colon provided a witness statement during the investigation which led to the discharge to Mr. Jackson.  (*Id.*).  Thus, Mr. Jackson was on notice that Mr. Colon was a potential witness, and Mr. Jackson could have deposed Mr. Colon before the summary judgment briefing was due.  He did not do so, but the Court later granted Mr. Jackson leave to depose Mr. Colon, requiring him to do so on or before December 4, 2017.  (ECF No. 67 at 2).  The Court advised Mr. Jackson that in order to consider any testimony from the deposition in the summary judgment decision, he would have to file a leave to supplement his Response in Opposition with Mr. Colon's deposition testimony.  (*Id.* at 3).  Mr. Jackson filed a notice to take Mr. Colon's deposition on November 16, 2017 (ECF No. 71), but never moved for leave to supplement his briefing with new facts from the deposition.  The record before the Court is clear that the information OD did not disclose initially—Mr. Colon's name and identity as a possible witness—was "otherwise made known to the parties during the discovery process." Fed. R. Civ. P. 26(e).  Thus, the Court **DENIES** Mr. Jackson's Motion to Strike the Affidavit of Ricardo Colon (ECF No. 66).[1]  The Court will now consider the merits of the Motion for Summary Judgment.

---

[1] The Court further finds that even if it does not consider Mr. Colon's affidavit, the summary judgment analysis below would remain unchanged and therefore the issue is of little relevance.

**B.** **FMLA Retaliation**

The FMLA entitles employees to take up to 12 work weeks of unpaid leave per year, for events including the birth of a child and the care of a parent. 29 U.S.C. at § 2612(a)(1). The FMLA makes it unlawful for "any employer to interfere with . . . any right provided under [the FMLA] . . . [or] to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a). Retaliation claims under FMLA are analyzed under the burden-shifting framework of *McDonnel Douglas Corp v. Green*, 411 U.S. 792 (1973). *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). A prima face claim for retaliation under the FMLA is thus established by showing:

> (1) that [plaintiff] was engaged in a statutorily protected activity; (2) [defendant] knew that [plaintiff] was exercising his FMLA rights; (3) he suffered an adverse employment action; (4) a causal connection existed between the protected FMLA activity and the adverse employment action.

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). To establish a causal connection under the last prong, "a plaintiff must show that an employee's use of FMLA leave was a significant factor motivating the retaliatory action. *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 675 (S.D. Ohio 2005) (quotations omitted). The prima face burden is minimal and all reasonable inferences must be drawn from credible evidence put forth by the plaintiff. *Id.* at 676. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Skrjanc*, 272 F.3d at 315. If the employer articulates such a reason, the plaintiff has the burden of showing the articulated reason is "in reality a pretext to mask discrimination." *Id.*

OD disputes only the last prong of Mr. Jackson's prima facie case—whether he established a causal connection between his use of FMLA leave ending on January 1, 2016, and his termination on April 6, 2016. (ECF No. 60 at 10). Mr. Jackson argues that once he returned

to work after his FMLA leave, he "started to receive adverse treatment." (ECF No. 63 at 13).[2] Specifically, Mr. Jackson testified that he felt tension with his supervisors, including William Pressler, Tony Green, and Robbie Smith. (ECF No. 60-1 at 214). He contends that the supervisors were writing him up for coming in late, but not writing anyone else up for the same behavior. (*Id.* at 214-215). He was terminated about three months later. OD argues that the temporal proximity is not enough to establish the causal connection here. (ECF No. 60 at 11). While some Sixth Circuit decisions suggest that temporal proximity must be coupled with other evidence of retaliatory conduct before a connection can be inferred, other decisions indicate that temporal proximity alone may support an inference of causal connection. *See Dage*, 395 F. Supp. 2d at 676-77 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 and *Skrjanc*, 272 F.3d at 314).

Here, Mr. Jackson's termination occurred approximately three months after he returned from leave, and he alleged further evidence of retaliatory conduct—tension with his supervisors, and getting written up for tardiness. (ECF No. 60-1 at 214-215). Given the minimal burden at the prima face stage, the Court finds this evidence sufficient to show a causal connection. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding discharge that occurred just over three months after protected action was sufficient to infer a retaliatory motive); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (finding "more frequent disciplinary write-ups of plaintiff for trivial matters" constituted evidence of retaliation).

---

[2] Mr. Jackson also argues in his response that Ms. Stone made it difficult to request FMLA leave—he had to request it three times, Ms. Stone told him it did not exist, Ms. Stone denied 15 other male employees their rights, and the policy is not readily available. But, as OD correctly points out in its Reply, these arguments are unsupported by any record evidence and thus cannot be relied on at the summary judgment stage. In any event, there is no dispute that Mr. Jackson was able to take his FMLA leave.

Next, OD argues that even if Mr. Jackson met his prima facie burden, OD articulated a legitimate, nondiscriminatory reason for terminating his employment: he engaged in two serious verbal altercations in one day that escalated to where co-workers felt compelled to intervene and physically separate the two employees. (ECF No. 60 at 12, 17). This Court agrees that OD articulated a legitimate, nondiscriminatory reason. The only remaining question, then, is whether Mr. Jackson meets his burden of showing that the articulated reason is pretext. Mr. Jackson has not done so here. He argues that the investigation OD performed into the altercations was of poor quality. For reasons more fully explained below in the discussion of Mr. Jackson's race discrimination claim, the Court finds that the investigation was sufficient, and even if Mr. Jackson shows that his termination was unfair, it does not mean that the true reason he was discharged was FMLA leave (or race discrimination). There is undisputed evidence in the record that other OD employees took FMLA leave and were not terminated. (ECF No. 60-2 at 38). Mr. McNair, the other employee involved in the altercation, was also terminated for the same reason as Mr. Jackson, and there is no evidence in the record that he took FMLA leave. (ECF No. 60-1 at 215). Thus, the Court finds that Mr. Jackson has not met his burden of showing that OD's proffered reason for his discharge was pretext. Summary Judgment in favor of OD is **GRANTED** as to Mr. Jackson's FMLA retaliation claim.

### C.    Defamation

To establish defamation under Ohio law, "the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, ¶ 77, 2012-Ohio-4193, 978 N.E.2d 832, 852

(Ohio 2012).  "Failure to establish any one of these elements is fatal to the claim."  *Anthony List v. Driehaus*, 779 F.3d 628, 632–33 (6th Cir. 2015).

In regards to the first prong, a false statement of fact under Ohio law is "a statement that sets forth matters which are not true or statements without grounds in truth or fact.  A statement is not a false statement if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it. Moreover, a statement that is subject to different interpretations is not false."  *Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (internal citations and quotation marks omitted) (quoting *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n,* 2004-Ohio-5662, ¶ 18, 158 Ohio App.3d 769, 822 N.E.2d 424, 430 (2004)).

Here, the statement Mr. Jackson alleges is false and defamatory is that he was "fighting on company property."  (ECF No. 63 at 14).  But Mr. Jackson does not dispute that he got into a verbal altercation on company property that had to be separated by co-workers—he testified about both of the two incidents that occurred on April 1.  (ECF No. 60-1 at 169-76).  He argues only that he did not get into a physical fight and that Mr. McNair was the one making threats and using profanity.  Regardless of whether these arguments are true[3], Mr. Jackson's defamation claim fails because "fighting" is clearly subject to at least two interpretations:  a violent struggle involving the exchange of physical blows, or verbally quarreling and arguing.  It is undisputed that a verbal quarrel occurred that got heated enough for co-workers to feel the need to intervene and report the conduct to management.  Given that the statement "Mr. Jackson was fighting on company property" is subject to multiple interpretations, it is not false as a matter of law.  *See Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (internal quotations omitted).  Thus,

---

[3] It is undisputed that the "fight" was not physical, but witnesses did testify that both Mr. McNair and Mr. Jackson were yelling and using profanity.  (ECF Nos. 60-5 at 9, 14).

Mr. Jackson cannot establish a defamation claim or a compelled defamation claim. Summary judgment in favor of OD is **GRANTED** as to the defamation claim.

### D. Disparate Treatment

Title VII provides that an employer may not "discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). "In order to establish discrimination under Title VII, a plaintiff must present either direct or circumstantial evidence of discrimination on the part of the employer." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). Here, the parties agree the *McDonnell Douglas* framework governs, and thus the Court applies the familiar three-step analysis. Mr. Jackson "must first establish the elements of a prima facie case." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing *McDonnel Douglas*, 411 U.S. 792, 802 (1973)). Plaintiff satisfies this burden by showing that he was: "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Establishing a prima face case is not an onerous task. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a prima face case, the burden shifts to the employer in the second step to "articulate a legitimate, non-discriminatory reason for taking the adverse action." *Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F. Supp. 3d 704, 713–14 (S.D. Ohio 2015). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Wheat*, 785 F.3d at 240 (quotations omitted) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

Finally, if the defendant meets its burden, the plaintiff then must prove that "the proffered reason was in fact a pretext designed to conceal unlawful discrimination." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). This can be done "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Wheat*, 785 F.3d at 240. At the final stage, the Court focuses on "the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530 (6th Cir. 2012).

Applying the first step of the *McDonnell Douglas* framework here, it is undisputed that Mr. Jackson meets the first two prongs necessary to establish a prima face case—as an African American, he is a member of a protected class and he was terminated from his employment with OD. As to the third prong, OD does not dispute that Mr. Jackson was qualified for his position. Thus, the only dispute as to whether Mr. Jackson meets his prima facie case centers around the final prong—whether he was treated differently than similarly situated employees. To satisfy this prong, Mr. Jackson "need not demonstrate an exact correlation with the employee receiving more favorable treatment" but to establish that an employee is "an appropriate comparator, the plaintiff must demonstrate that he . . . is similarly situated to the claimed comparator in all *relevant* respects." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709–10 (6th Cir. 2006) (internal quotations omitted) (emphasis in original). To meet this standard, the plaintiff and his proposed comparator must have engaged in acts of "comparable seriousness" which requires the court to look to whether the individuals "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it." *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998)).

Mr. Jackson points to four potential comparators or similar situations. First, he argues that he was treated differently that Mr. Pompi for two separate reasons. Mr. Pompi, a white employee, once used "the N word" in the break room in response to a joke about his age—he was asked how he liked the civil war, and responded that "it was great except for all those uppity N-word[s]." (ECF No. 60-7 at 16). Mr. Pompi upset three individuals in the breakroom, and was suspended for at least a half a day. (*Id.* at 16-17). Upon his return, he had a meeting with the other employees who were in the breakroom, and he apologized and admitted his "joke," which was intended to make fun of Confederates, was in poor taste. (*Id.* at 16-18). He was not terminated for his conduct. (*Id.* at 18). While the Court finds Mr. Pompi's conduct reprehensible, it is different in nature than the conduct in which OD found Mr. Jackson to have engaged. Mr. Pompi was attempting to make a joke (albeit in extremely poor taste) and apologized to all involved. There is no indication in the record that anyone had to separate Mr. Pompi from any other coworker as a result of his remarks or that anyone felt that his verbal statement put anyone at risk. Mr. Jackson also argues he was treated differently than Mr. Pompi because Mr. Pompi was given a chance to appeal his termination, while he was not. (ECF No. 63 at 21). But Mr. Pompi's termination was the result of driving violations, and there is an established appeals process for drivers. (ECF No. 60-7 at 13-16; 23-24). Mr. Jackson was not a driver and thus is not similarly situated.

Second, Mr. Jackson argues that he was treated differently than Mr. Anthony Frye and Mr. Kenny Timmons, both of whom are white. (ECF No. 63 at 20). Mr. Jackson alleges—with no citations to evidence in the record—that Mr. Frye and Mr. Timmons got into a non-work

related fight at work. He states that Mr. Timmons threw a water balloon at Mr. Frye, which angered Mr. Frye and resulted in a heated argument. Mr. Frye threatened to get an AK-47 and shoot Mr. Timmons. OD decided to terminate only Mr. Frye, because he made a threat of violence. As an initial matter, OD notes that Mr. Jackson does not point to any record evidence to support the facts alleged in his response. (ECF No. 65 at 11). In any event, OD argues that Mr. Timmons did not engage in any sort of altercation or exchange with Mr. Frye, which differentiates him from Mr. Jackson who did so here. (ECF No. 60-3 at 22-23).

The only evidence in the record about this alleged incident comes from Mr. Green and Mr. Pressler's depositions. Mr. Green testified that Mr. Frye, who is white, threatened to shoot his supervisor, Mr. Timmons, who is also white, and Mr. Frye was terminated as a result. (ECF No. 60-2 at 30-31). In response to whether there has ever been any "other situation between two other employees similar to the situation with McNair and [Mr. Jackson]," Mr. Pressler testified that there was an incident with Mr. Frye, where he commented about getting a gun and coming back in to work. (ECF No. 60-3 at 22). Mr. Pressler said he believed Mr. Frye made the comment to a supervisor, and when asked whether "there [was] an exchange between the supervisor as well" Mr. Pressler responded, "Not that I'm aware of." (*Id.*). Given the evidence in the record, there is not enough to support Mr. Jackson's argument that he was similarly situated to Mr. Timmons. Though Mr. Jackson disputes many characterizations of his verbal altercation with Mr. McNair, he does not dispute that he got off the forklift during the second incident and continued the argument with Mr. McNair, or that the two were separated by other co-workers. (ECF No. 60-1 at 175). There is no evidence in the record that Mr. Timmons engaged in any verbal altercation with Mr. Frye—only that Mr. Frye threatened him. Nothing in the record speaks to Mr. Timmons' reaction to Mr. Frye's threat, and there is therefore no way

for the Court to determine whether he was similarly situated to Mr. Jackson. Thus, Mr. Timmons cannot be a comparator.

Third, Mr. Jackson points to Mr. Michael Kline and Mr. Willie Brinson as potential comparators. (ECF No. 63 at 21-22). Mr. Jackson testified that Mr. Kline, who is Caucasian, "was yelling slurs and made a threat of violence against Willie Brinson, " specifically that he told him to "get the F out of his face or he was going to F him up." (ECF No. 60-1 at 265). Mr. Jackson stated that the employees "made physical contact with each other" and that he was the one who separated them. (*Id.*). Mr. Brinson testified that he and Mr. Kline engaged in a heated discussion because they were under time constraints at work. (ECF No. 60-10 at 11-12). He testified that they were equal aggressors, both "exchanged words" and were "face-to-face inside each other's personal space." (*Id.* at 12-13). Mr. Brinson did not remember any profanity being used. (*Id.*). After their exchange of words, Mr. Brinson and Mr. Kline went together into Mr. Pressler's office where they settled the dispute. (*Id.* at 12). Mr. Pressler testified that after the parties came to his office to explain the situation, they "shook hand[s] afterwards and went back to work." (ECF No. 60-4 at 60). Neither Mr. Kline nor Mr. Brinson was terminated as a result of their verbal altercation. (*Id.*).

The evidence indicates that this verbal disagreement was different in nature and severity than the altercation between Mr. Jackson and Mr. McNair. Mr. Kline and Mr. Brinson were under pressure because of time constraints related to working, which led to their verbal quibble about work-related issues. (ECF No. 60-10 at 11-13). They immediately went into a supervisor's office to explain the situation, and shook hands before leaving the supervisor's office. (ECF No. 60-4 at 60). Thus, neither Mr. Kline, nor Mr. Brinson (who is in the same protected class as Mr. Jackson) are sufficient comparators.

Finally, Mr. Jackson attempts to establish Mr. Fisher and Mr. Pryor as comparators. Mr. Jackson testified that Mr. John Fischer, who is Caucasian, was cussing at Mr. Robert Pryor, who is African American, and pointing in his face. (ECF No. 60-1 at 266). He stated that Mr. Fischer and Mr. Pryor made physical contact with each other and had to be separated. (*Id.*). Mr. Fischer and Mr. Pryor were not terminated for the incident, though Mr. Fischer no longer works for OD. (*Id.* at Ex. L; ECF No. 60-4 at 25). Mr. Pressler testified that he is not aware of any threats of violence that were made during the altercation, and that no severe profanities were reported to him. (ECF No. 60-4 at 25). OD argues that because there were no threats of violence, racial slurs, or profanities in relation to the dispute between Mr. Fischer and Mr. Pryor, the incident did not rise to the same level as the altercations between Mr. McNair and Mr. Jackson. (ECF No. 60 at 16).

The evidence on these issues, however, is conflicting—Mr. Jackson's testimony states that profanities were used and that the parties actually made physical contact and had to be separated, whereas Mr. Pressler's testimony states that he was "not aware" of threats of violence and that no profanities "were reported" to him. (ECF No. 60-1 at 266; ECF No. 60-4 at 25). The Court is aware that Mr. Jackson's testimony is self-serving, but "a court may not disregard evidence merely because it serves the interests of the party introducing it." *Schrack v. R±L Carriers, Inc.*, No. 1:10CV603, 2012 WL 2309365, at *9 (S.D. Ohio June 18, 2012) (citations omitted), *report and recommendation adopted*, No. C-1-10-603, 2012 WL 4061678 (S.D. Ohio Sept. 14, 2012), *aff'd sub nom. Schrack v. RNL Carriers, Inc.*, 565 F. App'x 441 (6th Cir. 2014). The "Court's role on summary judgment is not to weigh the evidence or make credibility determinations." *Id.* (internal quotations omitted). Thus, when viewing evidence in light most

favorable to Mr. Jackson, there is a genuine dispute of material fact as to whether Mr. Pryor and Mr. Fischer were similarly situated to Mr. Jackson.[4]

Turning to the second step in *McDonnell Douglas*' burden shifting framework, OD articulates a legitimate non-discriminatory reason for terminating Mr. Jackson, namely that he and Mr. McNair engaged in two serious verbal altercations in one day that escalated to where co-workers felt compelled to intervene and physically separate the two employees. (ECF No. 60 at 17). Thus, under the final step of the analysis Mr. Jackson must show that the proffered reasons are pretext for discrimination. This, he cannot do. To show pretext, Mr. Jackson must demonstrate that: (1) OD's proffered reason had no basis in fact; (2) that the proffered reasons did not actually motivate his discharge; (3) or that they were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chems.,* 29 F.3d 1078, 1084 (6th Cir.1994).

In analyzing the first *Manzer* prong, the Sixth Circuit has adopted an "honest belief" rule. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. Thus, Mr. Jackson must "put forth evidence that Defendants did not 'honestly believe' in the given reason for [his] termination." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007). In determining whether OD had an "honest belief" in the proffered basis for Mr. Jackson's discharge, OD must establish a "reasonable reliance" on the particularized facts available to it when firing Mr. Jackson. *Id.* at 502-03; *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) ("[A]n

_____

[4] The Court acknowledges that Mr. Pryor is a member of the same protected class as Mr. Jackson. It could be found, however, that because the incident he was a part of involved one Caucasian employee (Mr. Fischer), the entire encounter was treated differently than the altercation between Mr. Jackson and Mr. McNair, both of whom are African Americans.

employer establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.").

Mr. Jackson argues that OD cannot produce any witnesses that said that Mr. Jackson used severe profanity. (ECF No. 63 at 17). He argues that no witnesses could testify as to exactly what was said, and that the security video has no audio so cannot support OD's assertions that he used profanity or made any threats. (*Id*). Mr. Jackson acknowledges that Mr. Haynes testified that both Mr. McNair and Mr. Jackson used profanity, but argues that his statement is false and should not be considered for various reasons. (*Id.* at 18).

Even if Mr. Jackson's arguments that he did not use any profanity or make any threats of violence are true, however, OD has shown a reasonable reliance on the facts that were before it when the decision was made. Mr. Green and Mr. Pressler conducted multiple interviews, and some of the employees told them that the fight involved profanity, racial slurs, and threats of violence. (ECF No. 60-2 at 18-19, 30, Ex. 1; ECF No. 60-3, 18-19). Employees testified that both Mr. Jackson and Mr. McNair used profanities and racial slurs. (ECF No. 60-5 at 9, 14). Employees stated during the initial interviews that co-workers stepped in to separate Mr. McNair and Mr. Jackson before any physical altercation occurred. (ECF No. 60-2 at 18; ECF No. 60-4 at 57). In addition to conducting interviews, Mr. Green and Mr. Pressler reviewed security footage of the second altercation on the dock. (ECF No. 60-3 at 13; ECF No. 60-2 at 14, 29). Contemporaneous emails indicate that management discussed the incident with HR supervisors, and that HR employees believed both Mr. Jackson and Mr. McNair should be terminated because of the altercations. (ECF No. 62-2, Ex. 2; ECF No. 60-8 at PageID 1241). Thus, OD has presented sufficient evidence to find that it had a reasonable belief that it was appropriate to

terminate Mr. Jackson for his participation in the altercations with Mr. McNair, and Mr. Jackson's arguments that the investigation was not sufficient are not well taken.

The only potential argument that Mr. Jackson makes that OD did not honestly believe in its stated reason for termination is that OD changed its reason for discharge from "fighting on company property" to stating that Mr. Jackson "made a threat of violence, that he used severe profanity, and he was involved in an extended confrontation." (ECF No. 63 at 19). The Court, however, does not find that these statements are inconsistent. The fighting initially referred to by OD could certainly be a broader generalization of the more particularized description of the verbal altercations between Mr. Jackson and Mr. McNair. The difference in these two statements is not enough to show that OD's reason for terminating Mr. Jackson was pretextual, especially in light of the contemporaneous emails to HR mentioned above.

Under the second *Manzer* element, Mr. Jackson can establish pretext "by showing that it was more likely than not that Defendants terminated Plaintiff based on an illegal motivation." *Abdulnour*, 502 F.3d at 503–04 (internal quotations omitted). In other words, Mr. Jackson must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* As in *Abdulnour*, however, "here, the sheer weight of the evidence supports Defendant[], not Plaintiff." *Id.* As previously discussed, other witnesses testified that Mr. Jackson was involved in two verbal altercations in one day that had to be separated by other co-workers. The security video shows footage of Mr. Jackson and Mr. McNair engaging in an altercation. Contemporaneous emails indicate multiple employees were interviewed about the incident, and the evidence supported termination. Mr. Jackson does testify that he and other African American employees received "differential treatment," based on inconsistent application of some of the rules, such as being

written up for being tardy. (ECF No. 60-1 at 131, 141, 143). Mr. Jackson does not dispute that he has been tardy to work, however. (*Id.* at 146-47). He also testified that he was not ever suspended or terminated because of these inconsistent applications, nor did he ever experience a decrease in salary. (*Id.* at 149). In these circumstances, Mr. Jackson has not shown that OD's proffered reason for termination—engaging in two heated verbal altercations in one day—was pretext for racial discrimination.[5] Summary judgment in favor of OD is **GRANTED** as to the disparate treatment claim.

### E.     Violations of COBRA

"Under COBRA, employers are required to notify employees of their right to continue health-insurance coverage after a "qualifying event." *Perkins v. Rock-Tenn Servs., Inc.*, 700 F. App'x 452, 459 (6th Cir. 2017) (quoting 29 U.S.C. § 1166(a); 29 U.S.C. § 1162)). "Termination of employment is a qualifying event." (*Id.* (citing 29 U.S.C. § 1163(2)). If an employer fails to send required notice, a Court has discretion to award relief it deems proper, including a penalty of up to $100 per day. 29 U.S.C. § 1132.

It is undisputed that OD did not send a notice to Mr. Jackson within the required timeframe, as the notice was originally sent only to Mr. Jackson's Tampa, Florida address, which is used for child support. (*See* ECF No. 60-1 at Ex. O). OD argues—relying solely on a non-binding case—that the Court should decline to impose sanctions because it acted in good faith and quickly remedied the situation when it was brought to its attention. (ECF No. 60 at 22). OD

---

[5] Mr. Jackson makes no argument under the third *Manzer* element, that OD's proffered reason is insufficient to terminate employment. Nor can he—two heated verbal altercations in one day involving threats of violence and racial slurs, that rose to the level where co-workers felt it necessary to break up the fights and report them to management is a sufficient reason to terminate employment.

further argues that Mr. Jackson was not harmed by the COBRA violation, because he declined to elect COBRA benefits, even after OD extended the election period. (*Id.*).

This Court, however, has held that a plaintiff "does not need to demonstrate harm in bringing [a] civil enforcement action under COBRA," and sanctions can be awarded even when defendants do not act in bad faith. *Chenoweth v. Wal-Mart Stores, Inc.*, 159 F. Supp. 2d 1032, 1042-43 (S.D. Ohio 2001). In *Chenoweth*, the defendant sought summary judgment on plaintiff's claim of a COBRA violation, arguing that the plaintiff was not prejudiced by its failure to notify her of her COBRA rights. 159 F. Supp. at 1040. The Court found that the plaintiff need not demonstrate harm, reasoning that "providing appropriate notice is a key requirement under COBRA." *Id.* at 1042 (citing *McDowell v. Krawchison,* 125 F.3d 954, 957 (6th Cir.1997)). The Court noted that the "purpose behind the COBRA notice provisions is to ensure that qualified beneficiaries like [the plaintiff] are fully informed of their rights and have an opportunity to elect benefits if they so choose." *Id.* The Court thus granted the plaintiff's motion for summary judgment on the issue and denied the defendant's cross motion. *Id.* The *Chenoweth* court then examined the issue of how much recovery the plaintiff should receive, and held that she was entitled to attorney's fees and a statutory penalty, despite its finding that the defendant did not act in bad faith. *Id.* at 1043-44. The court noted that "duties under COBRA are not onerous, while the result of noncompliance could be disastrous for the discharged employee." *Id.* (citations omitted).

This Court finds the reasoning of the *Chenoweth* court on point and persuasive. OD is required by law to send COBRA notices to discharged employees. Its failure to do so could be disastrous to discharged employees and the Court thus has to "impress upon [OD] the importance

of providing employees with notice regarding continued health care coverage."  Accordingly, the Court **DENEIS** summary judgment as to the COBRA notice violation.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff's Motions for Leave to File Sur-Reply in Opposition to the Defendant's Motion Summary Judgment (ECF No. 68), and to Strike Affidavit of Ricardo Colon (ECF No. 66) are **DENIED**.  The Court hereby **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment (ECF No. 60).  The Motion for Summary Judgment is **GRANTED** as to all claims other than the COBRA violation claim, and **DENIED** as to the COBRA violation claim.

**IT IS SO ORDERED.**

_____ **s/ Algenon L. Marbley** _____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 28, 2018**